Charles Oster v. Commissioner.
Oster v. Commissioner
Docket No. 92833.
United States Tax Court
T.C. Memo 1964-335; 1964 Tax Ct. Memo LEXIS 2; 23 T.C.M. (CCH) 2072; T.C.M. (RIA) 64335; December 30, 1964
*2 Held, that petitioner was not engaged in a trade or business of organizing and promoting corporations and that gains and losses resulting from the sale by him of stock of corporations received by him, upon the organization of such corporations, in exchange for mining claims, constituted capital gains and losses, and not ordinary gains and losses. Held, further, that various expenditures made by petitioner on behalf of corporations in which he held interests are not deductible by him as ordinary and necessary expenses under section 212 of the Internal Revenue Code of 1954. Held, further, that certain expenditures made by the petitioner, including office expense and costs of assistance in preparing his income tax returns, are deductible as ordinary and necessary expenses under section 212; that the cost of an engineering report with respect to property which the petitioner considered buying, but did not buy, is deductible as either a loss in a transaction entered into for profit under section 165(c)(2) of the Code, or as an ordinary and necessary expense under section 212 of the Code; but that petitioner has failed to show that other amounts which he paid on his own behalf constitute *3 deductible items. Held, further, that certain sales of stock in 1954 resulted in long-term capital gain. Held, further, that the petitioner failed to show that a debt owing to him by one of the corporations in which he owned an interest became worthless in 1958, that he failed to show that certain other advances made by him to or on behalf of such corporation created debts, and that consequently he did not establish that he is entitled to any bad debt deduction for 1958. Fred R. Tansill and William T. Sherwood, Jr., for petitioner. James M. Carter, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1954 through 1958 in the respective amounts of $11,426.16, $26,548.12, $16,166.88, $6,848.37, and $20.09. By amendments to his answer the respondent makes claim for additional deficiencies for each year. The parties having reached agreement with respect to certain issues, the issues remaining for consideration are: (1) Whether the petitioner was engaged in the trade or business of organizing and promoting mining corporations with the consequence that gains and losses on sales of stock *4 received by him should be treated as ordinary gains and losses, as contended by respondent, or whether the stock so obtained should be considered as investments of the petitioner, the sale of which resulted in capital gains or losses, as contended by the petitioner; (2) Whether various expenditures, including those for legal and engineering services, for transportation, meals and lodging, entertainment and for office expense, constituted deductible ordinary and necessary expenses of the petitioner; (3) Whether certain stock sold by petitioner had been held by him more than 6 months at the dates of sale; and (4) Whether advances by the petitioner to a corporation constituted loans or contributions to capital, and if the former, whether such loans became worthless in the taxable year 1958 and are deductible as business or nonbusiness bad debts under section 166 of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner was married during the taxable years in question. For the taxable years 1954 through 1957 he filed separate returns with the district director of internal revenue at Reno, Nevada. For *5 the taxable year 1958 he filed a separate return with the district director of internal revenue at Baltimore, Maryland. He kept his books and records and filed his returns on the cash receipts and disbursements method of accounting. Petitioner was born in New York City in 1890. In 1910 he left New York and went to Texas and then to Arizona. From that time until the time of trial of this case he engaged in the acquisition of mining claims in Texas, Montana, Arizona, Nevada, Colorado, California, New Mexico, Idaho, Utah, and Canada. Most of such claims involved gold and silver, but some involved copper, lead, zinc, and uranium. In 1928, petitioner moved to Dayton, Nevada, and bought a large house, several vacant lots of land, and eight mining claims. One of the rooms in the house was used as his personal office. Petitioner's acquisition of mining claims usually came about as the result of the requests of prospectors who claimed to have made strikes and needed money for operation. Petitioner would inspect, and often have a preliminary engineering appraisal made of, the area. He would then acquire the claim from the prospector, receiving a quit claim deed from him. He would pay the prospector *6 cash for the claim and would sometimes agree to give the prospector, in addition, a block of stock in a corporation to be formed. He would then form a corporation and transfer the mining claim to it, receiving stock in exchange therefor, and, when he had so agreed, would cause the corporation to issue stock to the prospector. He would then cause the corporation to raise the money necessary to finance the mining operation by the issuance and sale to others of so-called penny stock, that is, low-priced stock, usually 10( or 25( per share. The petitioner would often finance the corporation in the interim by paying such items as legal fees and costs of engineering reports necessary to the sale of stock in the financing of the corporation. He would also, when necessary, pay on behalf of the corporation minimum amounts of $100 per mining claim per year for so-called "assessment work". Petitioner received no additional stock, and generally received no reimbursement, for any of the above-described expenditures, execpt that if the corporation was not successful in obtaining financing, he would sometimes later receive a note from the corporation for any amount he had paid for assessment work. *7 On only one occasion did the other stockholders advance money to assist the corporation. The petitioner's primary expectation of profit from his activities was through the increase in the value of his stock resulting from the corporation's successful development of the mines after obtaining the necessary financing by the issuance of stock. The petitioner would from time to time, as he needed money, sell stock of corporations which had been issued to him in exchange for property. He continued to hold some stock in most of the corporations which he formed. None of such corporations ever paid any dividends. The petitioner was an officer and director in some of the corporations, but received no salary for his efforts in their behalf. He never sold securities except those of corporations which he had organized. During the taxable year 1954 the petitioner held stock interests in a number of corporations which had been organized by him in prior years. Included among these were Como Mines Company (about a 7% interest), St. Joe Consolidated Mines Company, Rochester Consolidated Mines Company, Western Properties Company, Mountain Copper Mines, Royal Mines Company (about a 25% interest), and *8 Lucky Sunday Company. The address of these corporations was the house which petitioner owned in Dayton, Nevada. In 1954 petitioner was notified of a possible uranium strike in Ontario, Canada. He went to Montreal and entered into an agreement with the prospector, Harvey G. Greene, whereby he acquired 19 unpatented mining claims. He agreed to pay Greene $50,000 and cause a corporation to be formed to hold and exploit the mining claims, and he further agreed to cause such corporation to issue 250,000 shares of its stock to Greene. He paid $5,000 down, leaving $45,000 to be paid to Greene. On May 5, 1954, he organized, under the laws of Canada, a corporation, Cavendish Uranium Mines, Ltd. (hereinafter referred to as Canadian Cavendish) having 100,000 shares of authorized capital stock with a par value of $1 per share. Canadian Cavendish assumed the petitioner's obligation to pay Greene $45,000 and received the 19 unpatented mining claims in exchange for which it issued all of its stock to the petitioner and Greene. On May 14, 1954, petitioner caused the formation of Cavendish Uranium Mines Corporation (hereinafter referred to as Delaware Cavendish) under the laws of Delaware, with an *9 authorized capital of 3,000,000 shares of common stock of a par value of 10( per share. Delaware Cavendish issued 250,000 shares of its stock to Greene and 750,000 shares to petitioner in exchange for all outstanding stock in Canadian Cavendish. As additional consideration, petitioner also received two options to purchase additional stock from Delaware Cavendish, exercisable within a one-year period following June 1, 1954. One was for 200,000 shares at 10( per share, and the other, issued to H. R. Redington, petitioner's nominee, was for 200,000 shares at 25( per share. Petitioner then traveled to Pittsburgh in an unsuccessful attempt to raise the capital necessary to open Cavendish mines. Thereafter in 1954, Delaware Cavendish filed with the Securities and Exchange Commission a notification of its proposal to offer for public sale 230,000 shares at $1 per share. The offering was made through a broker and was fully subscribed in 1954. Thereafter petitioner made some 20 trips to Montreal, Canada, in an attempt to obtain a contract between Canadian Cavendish and the Atomic Energy Commission of Canada for the mining of uranium ore. The engineering reports and the preliminary ore findings *10 were favorable and Canadian Cavendish finally obtained a contract for $27,500,000 worth of uranium ore. The petitioner expended his own money in connection with these trips to obtain the contract. There was no understanding that he would be reimbursed by the corporation, and he was not so reimbursed. The petitioner's purpose in expending these sums was to accomplish the successful operation of the mining claims and thus enhance the value of the stock which he owned in Delaware Cavendish. In 1955 the petitioner exercised his option to purchase 200,000 shares of Delaware Cavendish stock at 10( per share and, through his nominee Redington, exercised his option and purchased 8,500 shares at 25( pershare. During 1954, 1955, and 1956 the petitioner sold large blocks of his stock in Delaware Cavendish. Additional funds were necessary to construct a mill to process the ore and the petitioner tried without success in Pittsburgh and New York to raise the estimated $9,000,000 necessary for such construction. He also made attempts to obtain the funds through a Boston banking house. The other stockholders desired to merge the corporation with another corporation and obtain the financing from a *11 different source. In 1956 they outvoted the petitioner and caused Delaware Cavendish to merge with Rare Earth Uranium Company, the merged corporation being known as Amalgamated Rare Earth Company. After the merger the petitioner had no part in the management of the company. The merged company failed to obtain the necessary financing and failed to perform the contract with the Canadian government. As a consequence, the Canadian Company took over the operation of the company. The stock of Delaware Cavendish which had been selling for about $2.50 per share at the time the contract with the Canadian government was executed dropped to a price of 20( per share. During the years 1954 through 1958 the petitioner disposed of all his Delaware Cavendish stock. [1] *12 The sales were to individuals and in most instances were in lots of several thousand shares. Several hundred thousand shares were sold at cost by the petitioner to officers and directors of Delaware Cavendish. In May 1954, after Delaware Cavendish had been incorporated but before its financing had been accomplished by the sale of stock through a broker, funds were required in order that petitioner might carry on cetrain activities on its behalf. The petitioner, not having the necessary funds, contacted Charles L. Kent in an effort to obtain the necessary funds from him. Kent agreed to advance to petitioner $10,000, suggesting that the petitioner post 50,000 shares of Delaware Cavendish stock as security. On May 17, 1954, the petitioner addressed a letter to Kent stating that he desired to obtain a loan from Kent in the sum of $10,000; that as security for the loan he agreed to deposit 50,000 shares of Delaware Cavendish stock (which shares he was entitled to receive from Delaware Cavendish); that upon receipt of Kent's check for $10,000 he would deliver to Kent a certificate or certificates for the 50,000 shares with proper stock powers attached; that in consideration of the loan he further agreed that *13 Kent should have the option to purchase from him the 50,000 shares of stock at 20( per share; that such option should be exercisable by Kent on or after December 1, 1954, and not later than December 15, 1954; that the option price should be applied in full payment of the $10,000 loan; that if the loan should not be repaid by December 1, 1954, and if Kent should not exercise the option, Kent should have the right to sell the 50,000 shares and to apply the proceeds of such sale to the loan; that Kent would look only to the collateral of 50,000 shares for repayment of his loan; and that petitioner would not be liable for any deficiency which might arise in the event Kent should receive less than $10,000 on the sale of the stock. Kent signified his acceptance of the agreement by affixing his signature upon a copy of the letter. Petitioner used the $10,000 which he received from Kent in connection with the business of Delaware Cavendish and at an undisclosed time he was repaid by that corporation. By notation, dated December 5, 1954, at the bottom of a copy of the above letter Kent noted that he exercised his option on the 50,000 shares of stock. The petitioner was also in need of additional *14 capital in order to do certain assessment work on some of his western properties. The petitioner contacted Hugo Campagnoli in an effort to obtain the necessary funds. On June 1, 1954, he wrote a letter to Campagnoli which was similar in all essential respects to the letter he had written to Kent, except that the amount obtained from Campagnoli was $20,000, the number of shares of stock of Delaware Cavendish deposited with Campagnoli was 82,500, the "option" price was $20,000, and the "option" was exercisable after December 2, 1954, and not later than December 16, 1954. Campagnoli signified his acceptance of the agreement by affixing his signature upon a copy of the letter. The petitioner did not repay either Kent or Campagnoli the amounts advanced by them and they retained the stock in consideration of the amounts of the advances. In his income tax return for the taxable year 1954 the petitioner reported long-term capital gain of $28,675 upon the sale of this stock to Kent and Campagnoli. In the notice of deficiency the respondent determined that such gain was short-term capital gain. The petitioner had, in 1945, formed a Nevada corporation called Rochester Consolidated Mines Company *15 (herinafter referred to as Rochester) for the purpose of mining gold and silver. The corporate address of Rochester was petitioner's office in Dayton, Nevada. The authorized capital of Rochester was 2,000,000 shares of no par value stock. Petitioner at no time held a majority of the stock in Rochester. At organization he had a 25% interest. In 1954 he held approximately 75,000 shares. The remainder of the issue had been sold to the public in compliance with SEC regulations. Petitioner was not an officer of the company. Because of the manpower shortage and government controls the company was virtually inactive. Following World War II the cost of labor rose and it became increasingly difficult to raise the money necessary to work the Rochester mines. On October 15, 1952, petitioner advanced to Rochester the sums of $2,200 and $4,463.21 evidenced by demand notes carrying interest at 6% per annum executed on behalf of the corporation by its president, Dryden Kozo, and by its secretary, W. H. Scott. These funds were for use by the company to pay wages and bills which were due. These advances were made by checks which the petitioner drew on his personal account and which were placed in the *16 bank account of Rochester. In addition, the petitioner drew a check on April 9, 1952, in the amount of $1,000 and one on July 14, 1953, in the amount of $500, both of which were deposited in Rochester's account. The petitioner made these advances in order that the proper assessment work could be done to insure that the corporation would not lose its mining rights. The petitioner also advanced the sum of $15,093.49 to M. E. Bohannon and Henry Koocher prior to April 30, 1955. Bohannon was the superintendent of Rochester under contract calling for a salary of $1,000 per month. Koocher was a watchman employed by the company. By May 26, 1955, the total amount which petitioner had advanced to Bohannon and Koocher was $16,960. On November 22, 1954, Bohannon executed an assignment to T. L. Withers, a trustee for the petitioner, of his claim for $13,960 against Rochester for wages due, wherein he directed the company to pay such sum to the trustee. Withers turned over the assignment to W. H. Scott, bookkeeper and secretary of the company, who acknowledged receipt thereof. In March 1955, petitioner paid $6,000 to Scott for back salary due Scott from Rochester. Scott had threatened to quit if *17 his back salary was not paid immediately. None of the above amounts was ever paid by Rochester to the petitioner. Since its date of incorporation in 1945 through the taxable year 1958, Rochester paid no dividends to its stockholders. For each of the years 1956, 1957, and 1958 it had a substantial deficit in working capital and had no current resources available for the satisfaction of its liabilities which were due and payable. In 1958 it transfered its assets, including its mining claims, to another company for 200,000 shares of stock of that company, and became inactive. In his return for the taxable year 1958 the petitioner claimed the amount of $15,093.49 as a business bad debt deduction. In the notice of deficiency the respondent disallowed the claimed deduction with the following explanation: The amount of $15,093.49 claimed by you as a business bad debt deduction, based on worthlessness of an alleged indebtedness of Rochester Consolidated Mines Company, is disallowed because you have not established the existence of the debt, or that the alleged debt became worthless during the taxable year. In the event that amounts were advanced for or on behalf of the corporation, it is held *18 that these constituted nondeductible capital contributions, or represented nonbusiness bad debts if they are found to be worthless in the taxable year. During some of the early years when the petitioner was operating mines in Nevada he spent most of his time there. From about 1934 to 1936 he was active in connection with mining properties in that area. He would often spend time in eastern cities, such as Pittsburgh and New York, for the purpose of obtaining financing from some of his wealthy friends and acquaintances who were located there. He was married in January 1936. His wife desired to live in the Magnolia section of Gloucester, Massachusetts. Accordingly, in 1937 the petitioner gave her $12,000 and she bought in her own name a house at Magnolia. Thereafter the petitioner spent additional amounts for improvements on the property. He was never a registered voter in Massachusetts and did not file state income tax returns there. He conducted no business from the house in Magnolia, but received some mail at that address. In 1954, when the petitioner became interested in the Cavendish mine in Canada, he spent much of his time in Canada. Up to about the middle of 1956, when Delaware *19 Cavendish merged with another company, the petitioner was general manager of the company without salary. Much of the rest of his time during the years in question was spent in New York City, although he made various trips to other places. During the years 1954 through 1958 Delaware Cavendish maintained its office in New York City. The petitioner occasionally received mail at that address. However, he was not listed as an occupant of that office, did not have a desk there, and did not use the facilities of that office while in New York. He employed public stenographers when necessary to write long business letters. A relatively small part of his time during the years in question was spent at the house in Magnolia. However, he did make trips to Magnolia. During the years 1954, 1955, 1956, and 1957 (through September) he made, respectively, 31, 27, 15, and 18 such trips, each trip averaging 2 days in duration. During this period 2 rooms at the house were set aside for him where he kept personal possessions, including clothing. In 1955 the petitioner purchased a house in his own name in Miami, Florida, in order that his wife, who was in ill health, could spend her winters there. He visited *20 her there a few times. The petitioner supported his wife during the time she lived in Magnolia and in Florida. During the years 1954 through 1957 the petitioner sent his wife checks totaling $67,378.89. He furnished all the funds necessary for the maintenance of the house in Magnolia, including real estate taxes, utilities, fuel, and food. In 1956 he transferred the title to the Florida house to his wife. In September 1957 a violent break occurred in the petitioner's relationship with his wife and he did not thereafter spend any time at the Magnolia house. Thereafter he went into an apartment in New York City with a friend and kept his personal belongings there. During the year 1954 the petitioner rented hotel rooms in various cities, principally New York. He made numerous trips to Montreal and Toronto, Canada, Pittsburgh, Pennsylvania, and Boston, Massachusetts. He made only one trip to Nevada in 1954 and stayed only a few days. During almost the entire year 1955, he maintained a room in a New York hotel. In 1955 he made 5 trips to Toronto, 1 to Montreal, 2 to Pittsburgh, 2 to San Francisco, California, 1 to Boston, and 2 to Reno, Nevada. During the year 1956, he maintained a room *21 at a New York hotel for the entire year. He made 5 trips to Washington, D.C., 2 to Pittsburgh, 2 to San Francisco, 2 to Miami, Florida, 1 to Toronto, 1 to Columbus, Ohio, and 1 to Spokane, Washington. Over the period January 1 to November 26, 1957, the petitioner rented rooms in various New York hotels covering approximately 200 days. He rented hotel rooms in Washington on 7 occasions for a total of approximately 16 days, in San Francisco on 4 occasions for a total of approximately 6 days, in Boston on 6 occasions for a total of approximately 31 days, in Buffalo, New York on 1 occasion for 1 day, in Pittsburgh on 1 occasion for 2 days, in Reno on 3 occasions for a total of approximately 20 days. During the year 1958 he rented hotel rooms in New York on 2 occasions for a total of approximately 13 days, in Washington on 17 occasions for a total of approximately 52 days, in San Francisco on 3 occasions for a total of approximately 4 days, in Boston on 5 occasions for a total of approximately 7 days, in Reno on 5 occasions for a total of approximately 54 days, and in Kellogg, Idaho, Buffalo, and Spokane on 1 occasion each for 1 day. In his returns for 1954 through 1957 the petitioner stated *22 his home address as Dayton, Nevada. In his return for 1958 he stated his home address as 509 Investment Building, Washington, D.C.
In his returns for each of the taxable years 1954 through 1958, the petitioner stated his occupation as "Mining Operator". Each return showed no receipts from business but business deductions in large amounts, resulting in a net loss from business operations. The total business deductions claimed for such years were $17,434.47; $29,592.80; $32,536.82; $25,367,38; and $36,762.12, respectively. The only income shown on such returns was gain from sales of stock of corporations which the petitioner had organized. Some of such gains were reported as long-term capital gains and some as short-term capital gains. The amounts reported as net capital gain, net business loss, and adjusted gross income were as follows: Schedule D
Net Capi-
Schedule C
Adjusted
tal Gain
Net Busi-
Gross In-
Year
or Loss
ness Loss
come
1954
$30,987.50
$17,434.47
$13,553.03
1955
61,148.55
29,592.80
31,555.75
1956
38,519.73
32,536.82
5,982.91
1957
19,900.00
25,367.38
( 5,467.38)
1958
574.50
36,762.12
(36,187.62)
The gains and losses from sales of stock were reported as follows: Date
Number
Pur-
Date
Name of Stock
of Shares
chased
Sold
Year 1954
Delaware Cavendish
30,000
5/17/54
6/ 3/54
Delaware Cavendish
152,500
5/17/54
11/25/54
Year 1955
Higgins Uranium
40,000
10/ /54
1/27/55
Delaware Cavendish
193,250
5/17/54
1955
Como Mines
50,000
1938
1955
St. Joe Con. Mines
29,000
1938
1955
Year 1956
Delaware Cavendish
101,000
1954
1956
St. Joe Con. Mines
30,000
1943
1956
Lucky Sunday Mines
50,000
1934
1956
Mt. Copper Mines
100,000
1947
1956
Year 1957
*
92,000
1955
1957
Year 1958
Delaware Cavendish
20,000
5/17/54
2/ 5/58
*23 Gross
Gain or
Name of Stock
Sales Price
Cost
(Loss)
Year 1954
Delaware Cavendish
$ 12,500.00
$ 250.00
$ 12,250.00
Delaware Cavendish
39,000.00
1,525.00
37,475.00
Year 1955
Higgins Uranium
10,000.00
900.00
9,100.00
Delaware Cavendish
134,096.60
14,085.00
120,011.60
Como Mines
960.00
8,000.00
(7,040.00)
St. Joe Con. Mines
550.50
9,425.00
(8,874.50)
Year 1956
Delaware Cavendish
97,500.00
6,605.00
90,895.00
St. Joe Con. Mines
600.00
9,750.00
(9,150.00)
None
Lucky Sunday Mines
(worthless)
3,137.36
(3,137.36)
None
Mt. Copper Mines
(worthless)
1,568.18
(1,568.18)
Year 1957
*
49,000.00
9,200.00
39,800.00
Year 1958
Delaware Cavendish
3,149.00
2,000.00
1,149.00
In no instance did the petitioner list any expenses of sale. In the notice of deficiency the respondent did not disturb the petitioner's treatment of the gains and losses as capital gains and losses, except as noted above with respect to the sales of stock to Kent and Campagnoli. The business deductions which the petitioner claimed in his returns for the taxable years in question (exclusive of the business bad debt in connection with Rochester claimed for 1958) were as follows: 1954
1955
1956
1957
1958
Office Expense
$ 1,761.84
$ 1,859.50
$ 2,295.00
$ 1,504.07
$ 763.82
Engineering
1,960.00
2,250.00
4,581.17
5,300.00
Expense
Management
3,000.00
Commissions
3,000.00
2,250.00
Professional
3,692.00
3,298.61
Expense
Legal Fees
3,536.70
1,800.00
Promotion
700.00
Entertaining
1,000.00
3,000.00
3,000.00
3,000.00
5,000.00
Transportation
4,505.23
3,896.95
4,006.43
3,968.87
2,572.63
Hotels
8,897.55
13,094.17
6,894.18
2,551.50
8,207.40
Meals
2,246.20
2,104.52
2,120.48
2,975.68
Total
$17,434.47
$29,592.80
$32,536.82
$25,367.38
$21,663.63
It *24 has been stipulated between the parties that the petitioner actually expended the amounts claimed for office expense, engineering expense, professional and legal expense, transportation expense, and hotel lodgings, meal and telephone. The petitioner received no notes for any of the listed expenditures, nor did he receive any additional stock or any reimbursement therefor. Office Expenses. The office expenses listed above were incurred in connection with an office which the petitioner maintained at the house in Dayton, Nevada, which he had purchased in 1928. Such house contained a private office for petitioner and offices where secretarial, bookkeeping, and engineering work was done. Prospectors went to such office to contact the petitioner. W. H. Scott, an accountant, worked full time at such office keeping books for some of the petitioner's corporations which had properties in that area and also keeping personal records for the petitioner. He rendered petitioner monthly statements and yearly trial balances. The petitioner paid Scott from time to time. From time to time the petitioner also employed full time at Dayton a stenographer and another accountant. The petitioner maintained *25 a telephone in this office and his name was listed in the classified section of the local telephone directory under the category "mining". Business mail was addressed to the petitioner at this office. Petitioner has maintained an active bank account in Carson City, the nearest city to Dayton, and has paid real estate taxes on his property every year. During the years in question the petitioner spent only a relatively small part of his time at his office in Dayton, but systematically and periodically checked with the office by mail and telephone. In the notice of deficiency the respondent disallowed the deductions claimed for lack of substantiation and for "failure to establish that it was your expense and not that of a (corporations) in which you have an (interests)". One-half of the stipulated amount paid by the petitioner in each of the years 1954 through 1958 was paid by him for the production or collection of income or for the management, conservation or maintenance of property held for the production of income. Engineering expenses. In 1956 the petitioner paid Lenox Rand, a mining engineer, $500 to inspect a number of mines which the petitioner considered buying in his individual *26 capacity but which he did not buy. In 1957 the petitioner paid Arthur Lakes, a geologist, an amount of $1,076.11 for engineering work in connection with property of the Como Mines Company and $100 for engineering work on a property which the petitioner individually owned. In 1957 the petitioner also paid W. E. Lorenger, a mining engineer, $1,000 for assessment work on property owned by Mountain Copper Company. In 1957 the petitioner also paid M. E. Bohannon $600 for assessment work in connection with six claims, known as the Carpenter property, which the petitioner owned individually, but which he later put into a corporation. In the same year he paid Bohannon $500 to examine a manganese property in Oregon. In the same year he also paid Bohannon $800 for assessment work on eight other claims which the petitioner owned individually. In 1957 the petitioner also paid $515.06 to Behard, Beldor & Company, an engineering firm, for engineering reports on property of the Como Mines Company. In 1958 the petitioner paid Bohannon $600 for assessment work on the six Carpenter claims. He also paid Bohannon $400 to examine a manganese property, and an additional $300 for undisclosed services in *27 connection with a personal interest of the petitioner. He also paid Bohannon $1,000 for assessment work on ten other claims known as the Peak claims, which the petitioner owned individually and two years later transferred to a corporation. In 1958 petitioner paid Arthur Lakes $3,500 for an engineering report on the Peak claims. In addition, petitioner paid Behard, Beldor & Company the sum of $2,500 for an engineering report on property of Como Mines Company. In the notice of deficiency the respondent disallowed as deductions the amounts claimed as engineering expenses for 1954 and 1956, but treated such amounts (and an additional amount of $59.12 for 1954) as "additional cost and/or selling expenses" of Delaware Cavendish stock, thereby reducing the amounts of gains reported on sales of such stock. He disallowed the amounts claimed for 1957 and 1958 for "failure to establish that it was your expense and not that of a (corporations) in which you have an (interests)." Management. The parties have stipulated that in 1955 the petitioner paid Bohannon the sum of $3,000 which was deducted as a management fee. This amount was expended by the petitioner in order to perform the necessary assessment *28 work on mining claims owned by Como Mines Company. The respondent disallowed the amount claimed for lack of substantiation and for failure to show that the expenditure was petitioner's expense and not that of a corporation or corporations in which he had an interest. Commissions. In the notice of deficiency the respondent disallowed the amounts of $3,000 and $2,250 claimed as deductions by the petitioner for the years 1955 and 1956, respectively, but held that these amounts were selling expenses of Delaware Cavendish stock, thereby reducing the amounts of gains reported on sales of such stock. The parties have stipulated that the amounts of $3,000 and $2,250 constituted expenses of sales by the petitioner of his stock of Delaware Cavendish. Professional and legal fees. In 1955 the petitioner paid Irving Weissberg, an accountant, the sum of $300 for services rendered in connection with the preparation and filing of his income tax return. In 1956 the petitioner paid the sum of $3,334.60 in defense of a legal suit instituted against him personally by Harvey G. Greene, the prospector and co-incorporator of Canadian Cavendish and Delaware Cavendish. After Greene had received cash and *29 250,000 shares of Delaware Cavendish he demanded more stock of Delaware Cavendish. In 1956 the petitioner also paid James G. Towles, an attorney, the sum $100of for legal services rendered in connection with property owned by Royal Mines Company. In 1957 the petitioner paid Weissberg the sum of $300 in connection with the preparation and filing of his income tax return. In 1958 the petitioner paid the sum of $1,500 to a Nevada law firm for legal services performed in connection with some of his companies. In the same year he paid another attorney the sum of $300 in connection with the preparation of his income tax return. In the notice of deficiency the respondent disallowed the amount of $3,692.60 claimed as a deduction for 1955, but allowed that amount, and an additional amount of $532.50, as additional cost and/or selling expense of the petitioner's Delaware Cavendish stock, thereby decreasing the reported amount of gain on the sale of such stock. The respondent determined that one-half of the amounts claimed as deductions for the years 1956 and 1957 constituted additional cost and/or selling expense of petitioner's Delaware Cavendish stock, thereby reducing the reported gain on *30 the sale of such stock; the remaining one-half of each claimed amount was disallowed as a deduction for lack of substantiation and for failure to establish that it was petitioner's expense and not that of a corporation or corporations in which he had an interest. The respondent disallowed the full amount of the deduction claimed for 1958 for lack of substantiation and on the ground that the petitioner had failed to show that the amount constituted petitioner's expense and not that of a corporation or corporations in which he had an interest. Promotion. In 1958 the petitioner paid Jess Whitley $700 for promotional expenses in connection with the attempted financing of Amco Mines Company. The respondent disallowed the claimed deduction for lack of substantiation and for failure to establish that the amount constituted petitioner's expense rather than an expense of a corporation or corporations in which he had an interest. Entertaining. The parties have stipulated that in each of the years in question the petitioner expended $3,000 for entertainment. In the notice of deficiency the respondent disallowed the full amount claimed for the year 1954, but allowed such amount as additional *31 cost and/or selling expense of the petitioner's Delaware Cavendish stock, thereby decreasing the amount of gain reported on sales of such stock. For the years 1955, 1956, and 1957 the respondent allowed one-half of each amount claimed as additional cost and/or selling expense of the Delaware Cavendish stock, thereby reducing the amount of the reported gain. He disallowed the remaining one-half for lack of substantiation and for failure to show that it constituted the petitioner's expense rather than the expense of a corporation or corporations in which he owned an interest. The respondent disallowed the full amount claimed as a deduction for the year 1958 for lack of substantiation and for failure to show that it was the petitioner's expense rather than that of a corporation or corporations in which he had an interest. Transportation. In the notice of deficiency the respondent allowed as additional cost and/or selling expense of the petitioner's Delaware Cavendish stock (thereby reducing the reported gain on sales of such stock) $3,604.18 of the amount of transportation expenses claimed for 1954; $3,117.56 of the amount claimed for 1955; $3,205.14 of the amount claimed for 1956; and *32 $1,984.44 of the amount claimed for 1957. He disallowed the remainder of the amounts claimed as deductions for those years, and the full amount claimed for 1958, for lack of substantiation and for failure of the petitioner to establish that such amounts constituted his expenses rather than those of a corporation or corporations in which he had an interest. Hotels and Meals. The following tabulation shows the amounts which the petitioner expended for hotel lodgings, meals and telephone expense in New York City and the amounts expended therefor while away from New York City: Hotel
Hotel
Total
Lodgings,
Lodgings,
Hotels,
Meals and
Meals and
Meals and
Telephone
Telephone
Telephone
Expense,
Expense
Expense,
New York
away from
Per
Year
City
New York
Returns
1954
$ 5,314.95
$2,892.45
$ 8,207.40
1955
8,231.21
2,912.54
11,143.75
1956
11,720.56
3,478.13
15,198.69
1957
7,075.10
1,939.56
9,014.66
1958
2,350.83
3,176.35
5,527.18
(Meais only)
In the notice of deficiency the respondent disallowed the full amounts claimed for each of the years, with the following explanation: It is held that the alleged business expenses for hotels and meals was for nondeductible living expenses within the meaning of section 262 of the Internal Revenue Code of 1954 *33 and was not incurred in any business carried on by you or for the production or collection of your income or for the conservation, management or maintenance of your property within the meaning of sections 162 and 212 of the Internal Revenue Code of 1954. Opinion The primary issue is whether the petitioner was engaged in the carrying on of a trade or business of organizing and promoting mining corporations with the consequence that gains or losses upon sales, in the taxable years 1954 through 1958, of stock which petitioner had received upon the organization of various corporations constituted ordinary gains and losses or capital gains and losses. During the taxable years in question and for many years prior thereto the petitioner had been engaged in the acquisition from prospectors of various types of mining claims in the United States and Canada. Sometimes he held these claims individually and sometimes he formed corporations to hold and develop the mines. In many instances he paid the prospector cash and also agreed to have corporate stock issued to the prospector. When a corporate form was employed the petitioner would transfer the claims to the corporation in exchange for stock. *34 The corporation would then proceed to market its remaining authorized stock for the purpose of financing the development of the mines. Such stock would generally be marketed for the corporation by the petitioner, but on some occasions a broker or underwriter was employed. Until such time as the corporation acquired capital in this manner the petitioner customarily furnished the necessary financing, receiving no additional stock therefor. In most instances he was not reimbursed by the corporation for any such expenditures, nor did he receive any compensation from the corporation for marketing its stock. Nor did he receive any compensation as an officer or director. The petitioner's primary expectation of profit was through the increase in the value of his stock resulting from the successful development of the mines by the corporations after they had obtained adequate financing through the issuance and sale of other stock. The petitioner continued to hold stock in most of the corporations which he organized but would from time to time, as he needed money, sell some of such stock. In his returns for the years in question the petitioner stated his occupation as being "mining operator" *35 and claimed deductions, ostensibly as ordinary and necessary business expenses, of various unreimbursed expenditures which he had made for engineering fees, travel, entertainment, etc. He did not, however, treat gains and losses from the sales of his stock as ordinary gains and losses, but reported them as capital gains and losses. On brief he denies that he was engaged in a trade or business, within the contemplation of section 162 of the Internal Revenue Code of 1954, maintains that his stock was held for investment, that the sales thereof resulted in capital gains or losses, and that he is entitled to the claimed deductions as nonbusiness deductions under section 212 of the Code. The respondent in the notice of deficiency treated the gains and losses as capital gains and losses. He disallowed all the deductions claimed, some because of lack of substantiation and some because he determined that they did not constitute either business or nonbusiness expenses of the petitioner. He did, however, treat a portion of the claimed deductions as either additional cost of, or selling expenses in connection with, petitioner's stock in Delaware Cavendish, there-by reducing the amount of gain *36 reported. By amendment to his answer the respondent alleged, and he contends on brief, that the petitioner was in the business of organizing and promoting mining corporations which included the sale of the stock issued to him, that such stock constituted his stock in trade, [2] and that therefore the gains and losses upon the sales of such stock should be treated as ordinary business income. In Whipple v. United States, 373 U.S. 193, the Supreme Court, relying upon several of its prior decisions, clearly pointed out that devoting one's time and energy to the affairs of a corporation, or to many corporations, is not of itself a trade or business of the person so engaged; that although such activities *37 may produce income in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself; and that, absent substantial additional evidence, the furnishing of management and other services to corporations for a reward no different than that flowing to an investor in those corporations does not constitute the carrying on of a trade or business. The Court did recognize that "the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations * * * for a profit on their sale, * * * but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *," but held that since in the case before it, the taxpayer had no intention of developing the corporations as going business for sale to customers in the ordinary course (but, rather, actively engaged in serving his own corporations for the purpose *38 of creating future income through the corporate enterprise) he was not engaged in a trade or business. In the instant case it is clear that the petitioner was not engaged in developing the corporations as going businesses for sale to customers. His custom was to invest his funds in mining claims and transfer them to corporations in exchange for stock, often a minority stock interest. The profit which he expected to derive from his activities would result from the enhancement in the value of his stock, resulting from activities of the corporation in securing financing and developing the mines. He generally continued to hold his interests in the corporations for an indefinite time. The substance of the petitioner's testimony was that he did not hold his stock for immediate sale but sold it from time to time as he needed money, the sales being made to his friends or friends of the directors of the corporations. It is to be noted that the greater part of the stock which the petitioner disposed of in the years in question was Delaware Cavendish stock. That corporation was organized in 1954, and the petitioner sold some of his Cavendish stock in each of the taxable years. The stock of other *39 corporations disposed of was, with one exception, stock which petitioner had held for periods of from 9 to 22 years. Under the circumstances here presented, it must be concluded that the petitioner's activities did not constitute the carrying on of a trade or business of organizing and promoting corporations. His activities with respect to the affairs of the corporations which he organized were those of an investor. His expected return, and the return which he actually received, was no different than that flowing to the ordinary investor in corporate stocks. Whether the petitioner's activities in connection with the properties which he acquired and continued to own in his individual capacity amounted to the carrying on of a trade or business, we need not consider. Even if so, the setting up of the corporations and the conduct of business by them would not constitute part of such trade or business. Dalton v. Bowers, 287 U.S. 404. The stocks which petitioner received upon the organization of the corporations and the transfer of mining claims thereto did not constitute stock in trade or property held primarily for sale to customers in the ordinary course of a trade or business. Such *40 stocks were capital assets, the sale of which resulted in capital gain or loss. Section 1002 of the Code. On brief the respondent contends in the alternative that Delaware Cavendish was a collapsible corporation within the meaning of section 341 of the Code, and that therefore under that section the gain from the petitioner's sales of the stock of that corporation should be considered as gain from the sale or exchange of property which is not a capital asset. The respondent made no such determination in the notice of deficiency. Such issue was not raised by the respondent in his answer, nor was the subject mentioned at the trial of the case. It was not until 3 weeks after the trial of the case was concluded that the respondent filed a motion requesting leave to amend his answer and raise the collapsible corporation issue. His motion, having been filed after the case had been tried on an entirely different theory, was untimely and was denied. Under the circumstances the issue is not before us for consideration. Included in the sales of Delaware Cavendish stock which the petitioner reported in his return for the taxable year 1954 were sales of 50,000 shares to Charles L. Kent and 82,500 *41 shares to Hugo Campagnoli. The transactions were substantially identical except in the case of Kent the amount received by the petitioner was $10,000 and in the case of Campagnoli the amount received by the petitioner was $20,000. We have set forth in the Findings of Fact the details of the agreements between the petitioner and Kent and Campagnoli. The respondent takes the position that in each instance there was a sale of stock at the time the agreement was executed, namely, May 17, 1954, and June 1, 1954, and that the gain derived was short-term capital gain since the petitioner's holding period for the stock commenced on the date the Delaware Cavendish Company was formed, May 14, 1954. He contends that the consideration for the transfers of stock was received by the petitioner at the time of the execution of the agreements and that thereafter nothing remained to be done to accomplish a complete transfer of right, title, and interest in the stock. He states that the petitioner retained no right to rescind the transfer by repayment of the money and that it must be inferred that the transactions were cast in the form of a loan for 6 months merely for the purpose of giving the petitioner *42 a longer holding period and that the arrangement was no more than an accommodation by the purchasers. The petitioner, on the other hand, contends that the transactions involved loans to him from Kent and Campagnoli and the pledging of the stock to them as security, coupled with options granted to Kent and Campagnoli to purchase the stock for the amount of the loans if the petitioner did not repay the loans on the specified dates. He therefore contends that the sales of stock did not occur until Kent and Campagnoli exercised their options to retain the stock and applied the advances in payment therefor. There is no evidence to show that the letter agreements, the provisions of which are summarized in the Findings of Fact, did not represent the actual and full agreements between the petitioner and Kent and Campagnoli. Those agreements clearly provide that the petitioner had the right, up to the specified dates, to repay the amounts advanced and regain possession of the stock. It seems clear, therefore, that up to that time the stock was merely pledged, with ownership remaining in the petitioner. By the same token Kent and Campagnoli did not, prior to the specified dates, have any of *43 the attributes of ownership thereof. It was not until they, pursuant to the terms of the agreements, appropriated the stock in payment for the advances that they became the owners of the stock. Under the circumstances it must be concluded that the stock in question was held by the petitioner for more than 6 months prior to the sales and that, under section 1222(3) of the Code, the gain realized by the petitioner upon such sales was long-term capital gain. In his return for the taxable year 1958 the petitioner deducted the amount of $15,093.49 as a business bad debt under section 166 of the Code. [3] *44 By amended pleading the petitioner claimed that he is entitled to a deduction of at least $22,593.14 for 1958 as business bad debts. The details of the various advances made to or on behalf of Rochester are set forth in the Findings of Fact. The respondent contends that, with the possible exception of $6,663.21, none of the amounts in question constituted debts. He further contends that any amounts which might be deemed to be debts have not been shown to have become worthless in the year 1958, and that if they were so shown they would be allowable only as nonbusiness bad debts under section 166. The amount of $6,663.21 represents sums advanced by the petitioner to Rochester in 1952 and is evidenced by two demand notes of the corporation carrying interest at 6% per annum. We see no reason for concluding that these were not bona fide loans as they purported to have been. However, the *45 burden of proof is upon the petitioner to establish that they became worthless and the year in which they became worthless. Denver & Rio Grande Western Railroad Co., 32 T.C. 43, affd. (C.A. 10) 279 F. 2d 368. Upon the evidence here presented we cannot find that these debts were worthless in 1958. The only evidence as to the financial condition of the company in that year is the report of auditors to the effect that in 1956, 1957, and 1958 the corporation had a substantial deficit in working capital and that it had no current resources available for the satisfaction of its liabilities which were due and payable. We do not have any evidence as to the total amount of its liabilities or the value of its assets. It did, in 1958, transfer its assets to another corporation in exchange therefor. The petitioner testified that the stock of such other company had no value because it was not operating. However, we do not consider this as sufficient evidence to show that it had no fair market value or that the claims against Rochester, including the debts in question, were wholly worthless in that year, as required for the deduction of a nonbusiness debt under section 166 of the Code. [4] It may *46 be added that if such debts were worthless in 1958, the petitioner has not shown that they became worthless in that year, or in any taxable year which is before us. As stated, the report of the auditors showed that the financial condition of Rochester was the same in 1956, 1957, and 1958. Its condition may have been the same in 1954 and 1955, for all that the evidence shows. The petitioner contends that the statute of limitations ran against collection of these debts in 1958 and that this establishes that they became worthless in that year. Suffice it to say that it is well established that the running of the statute of limitations does not of itself prove the worthlessness of a debt. Commissioner v. Burdette, (C.A. 9) 69 F. 2d 410, affirming 25 B.T.A. 692. With respect to the other amounts advanced by the petitioner to or on behalf of Rochester, there is no evidence to show that there were any notations or evidences of indebtedness, that any interest was paid, or that any time was fixed for repayment by Rochester. In such circumstances *47 it cannot be held that the advances were debts; they were capital contributions by the petitioner to Rochester. Root v. Commissioner, (C.A. 9) 220 F. 2d 240, and American-LaFrance-Foamite Corporation v. Commissioner, (C.A. 2) 284 F. 2d 723, each affirming a Memorandum Opinion of this Court. This applies equally to the amount of $13,960 which the petitioner paid to Bohannon on account of wages due Bohannon from Rochester. This amount had apparently been paid by petitioner over a period of time up to November 22, 1954, when Bohannon executed an instrument purporting to assign to petitioner his claim for wages due from Rochester. Insofar as appears from the record, the petitioner in making payments to Bohannon was making payments on behalf of Rochester and thereby extinguishing to that extent any claim for wages which Bohannon had against the corporation. There remains for consideration the question of the deductibility, under section 212 of the Code, [5] *48 of the various amounts which the petitioner claimed for each of the years in question. There are set forth in the margin pertinent provisions of section 1.212-1 of the Income Tax Regulations.[6] *49 *50 The origin of the statutory provisions above-quoted is section 121(a) of the Revenue Act of 1942, which enacted section 23(a)(2) of the Internal Revenue Code of 1939. Prior thereto section 23(a)(1) allowed deductions only for expenses incurred "in carrying on any trade or business." The intention of Congress in enacting the new provisions was to provide for a class of deductions coextensive with the business deductions allowed by section 23(a)(1), except for the requirement that the income-producing activity qualify as a trade or business. Sections 23(a)(1) *51 and 23(a)(2) of the 1939 Code (and hence sections 162(a) and 212 of the 1954 Code) are in pari materia. United States v. Gilmore, 372 U.S. 39. In enacting these provisions Congress made it clear that the deduction for nonbusiness expenses is subject, except for the requirement of being incurred in connection with a trade or business, to all the restrictions and limitations that apply in the case of the deduction of an expense paid or incurred in carrying on a trade or business. H. Rept. No. 2333, 77th Cong., 2d Sess. , p. 75; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 88; and United States v. Gilmore, supra.
One of the restrictions or limitations upon the deductibility of both business and nonbusiness expenditures is that expenditures which are capital in nature [7] *53 are not deductible as ordinary and necessary expenses. Bowers v. Lumpkin, (C.A. 4) 140 F. 2d 927, certiorari denied 322 U.S. 755; Robert L. Wilson, 37 T.C. 230, affd. (C.A. 5) 313 F. 2d 636; Iowa Southern Utilities Co. v. Commissioner, (C.A. 8) 333 F. 2d 382, affirming a Memorandum Opinion of this Court; and Commissioner v. Doering, (C.A. 2) 335 F. 2d 738, affirming 39 T.C. 647. We stated in the Wilson case: *52 A capital expenditure is not regarded as a charge against current income and is not deductible as an "ordinary and necessary expense," whether it is made in the course of business or whether it is made in relation to the nonbusiness situations specified in section 23(a)(2) of the 1939 Code and section 212 of the 1954 Code. Bowers v. Lumpkin, supra, at 928-929; Louisiana Land & Exploration Co., 7 T.C. 507, 515, affirmed 161 F. 2d 842 (C.A. 5); Safety Tube Corporation, 8 T.C. 757, 762-764, affirmed 168 F. 2d 787 (C.A. 6). The mere fact that the new provisions refer to expenses for the "management, conservation, or maintenance of property held for the production of income" does not dispense with the limitation that the deduction is not allowable in the case of capital expenditures. Those new provisions merely define the area in which nonbusiness expenses may be deducted provided that they otherwise satisfy the conditions for deductibility, one of those conditions being that the expenditure must not be capital in nature.
Expenditures which the petitioner made on behalf of any of the corporations in which he was a stockholder are not his ordinary and necessary expenses, but those of the corporations. Jacob M. Kaplan, 21 T.C. 134, and Harry Kahn, 26 T.C. 273. They are not deductible by him but may constitute contributions to the capital of the corporations and hence constitute an additional cost of his investment in the corporations. H. William Ihrig, 26 T.C. 73; Jean U. Koree, 40 T.C. 961, and cases cited therein. The respondent disallowed all the deductions claimed on various grounds - either on the ground that they were not petitioner's expenses but were those of corporations in which he owned an interest, that they were selling expenses in connection with sales of stock, that they were personal expenses, or that they were not substantiated. He now concedes that most of the amounts claimed were actually expended by the petitioner, but has not conceded that they constitute deductible items. The respondent's disallowance of the claimed deductions has the support of a presumption of correctness and the petitioner has the burden *54 of showing that he is entitled to the deductions. Welch v. Helvering, 290 U.S. 111, and New Colonial Ice Co. v. Helvering, 292 U.S. 435. The petitioner has not, except in a few instances, presented evidence to show error in the respondent's disallowance of the deductions claimed. With respect to some items no evidence whatever has been adduced. We will discuss each category of deduction claimed, making such corrections of the respondent's determinations as are justified by the record. Except as agreed upon by the parties or as specifically pointed out herein, the respondent's determinations are approved. Office expenses. The respondent has conceded that the petitioner paid the amounts which he claimed for each of the years 1954 through 1958 for office expenses, but contends that no portion thereof is allowable since there is no basis for allocating such expenses between those incurred by the petitioner on his own behalf and those incurred on behalf of corporations in which he owned an interest. From the evidence submitted it is clear that these expenditures were in connection with the Dayton, Nevada, office which was used as an office by both the petitioner personally and by some *55 of the corporations in which he had an interest. We are satisfied that some portion of the expenses constituted ordinary and necessary expenses paid by the petitioner for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income, within the meaning of section 212 of the Code. [8] See section 1.212-1(g) of the Income Tax Regulations. Upon the record we can make only a rough approximation of such portion, but we feel it incumbent upon us to make the best estimate we can. Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540. This we have done, and have found as a fact that one-half of the office expenses claimed for each of the years in question constitute deductible ordinary and necessary expenses paid for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Engineering *56 expenses. The respondent disallowed as deductions the amounts claimed by the petitioner as engineering expenses for the years 1954 and 1956, but treated such amounts as additional cost of, or selling expenses of, petitioner's Delaware Cavendish stock sold in those years, thereby reducing the amounts of gains reported on the sales. He also disallowed the amounts claimed for 1957 and 1958 on the ground that the petitioner had failed to show that the expenses were not those of a corporation or corporations in which petitioner held an interest. The evidence shows that some of the expenses claimed were made in connection with properties owned by corporations in which the petitioner held an interest and that some were made in connection with properties which the petitioner owned individually. Clearly amounts paid on behalf of the corporations are not deductible by the petitioner. We have set forth in the Findings of Fact the amounts which were paid by the petitioner in connection with properties which he owned in his individual capacity. In 1957 he paid $1,400 and in 1958 he paid $1,600 for "assessment work" in connection with mining claims which he owned in his individual capacity. The *57 petitioner testified that after a mining claim is registered it is necessary under state law to do a minimum of $100 worth of work on each claim each year in order to retain the claim; that otherwise title to the claim is lost and the property is open for location by others. However, he did not describe the nature of the work done but merely referred to it as "location work." Nor has he referred us to any state statute under which he claims any particular "assessment work" was done. Under the circumstances, we must conclude that the petitioner has not shown that the expenditures constitute deductible ordinary and necessary expenses. [9] They may have been nondeductible capital expenditures. The evidence also shows other expenditures which petitioner made in 1957 and 1958 on his own behalf, rather than on behalf of the corporations. For those two years he paid, respectively, $500 and $400 for engineering examinations of manganese property, and $100 and $300, respectively, *58 for unidentified engineering services. In 1958 he also paid $3,500 for engineering work on certain mining claims which he owned individually. Here again we are unable from the record to determine that these amounts did not represent nondeductible capital expenditures, and therefore hold that petitioner has failed to establish his right to deductions on account thereof. In 1956 the petitioner paid a mining engineer $500 to examine a number of mines which he considered buying in his individual capacity, but which he did not buy. We think the petitioner is entitled to a deduction of the $500 as either an ordinary and necessary expense under section 212 of the Code, or as a loss in a transaction entered into for profit, pursuant to section 165(c)(2) of the Code. Except in this respect the respondent's disallowance of the deductions claimed for engineering expenses is approved. Consistently, this $500 will be eliminated as an additional cost and/or selling expense of the petitioner's Delaware Cavendish stock. Management. The amount of $3,000 which petitioner deducted in 1955 under this category was in reality an amount paid for "assessment work" on mining claims owned by Como Mines Company. *59 This amount, having been paid on behalf of Como Mines Company, does not constitute an item deductible by the petitioner. Professional and legal fees. For 1955 the respondent disallowed the full amount of the claimed deduction of $3,692.60 but allowed it as additional cost or selling expense of the petitioner's Delaware Cavendish stock, thereby decreasing the reported amount of gain on the sale of such stock. It has been shown that $300 of the amount claimed represented a fee paid to an accountant for services in connection with the preparation and filing of petitioner's income tax return. Such $300 is specifically deductible under section 212(3) of the Code. Consistently, such amount will not be treated as an additional cost or selling expense of the petitioner's Delaware Cavendish stock. In all other respects the respondent's disallowance of claimed deductions for professional and legal fees for 1955 is approved for failure on the part of the petitioner to show that any such other legal fees constituted deductible items. For 1956 the respondent disallowed the full amount of $3,536.70 claimed as a deduction, but allowed one-half that amount as additional cost or selling expense of *60 the petitioner's Delaware Cavendish stock, thereby decreasing the reported amount of gain on the sale of such stock. The petitioner has failed to show error in the respondent's determination in this respect. The petitioner did establish that of the amount claimed $3,334.60 was in defense of a legal suit instituted against him personally by Harvey G. Greene, who claimed the right to receive more than 250,000 shares of Delaware Cavendish stock. This amount apparently constituted a cost of defense of title to the petitioner's Delaware Cavendish stock. We cannot conclude from the evidence that the respondent erred in disallowing the full amount claimed and allowing no more than one-half the amount claimed as an additional cost of the Delaware Cavendish stock sold in 1956. For 1957 the respondent disallowed as a deduction the full amount of $3,298.81 claimed, but allowed one-half of the amount as additional cost or selling expense of petitioner's Delaware Cavendish stock. The petitioner has not shown error in this determination of the respondent, except that $300 of the amount claimed represented payment to an accountant in connection with the preparation and filing of his income tax return. *61 Except for the allowance of this $300 as a deduction, the respondent's determination with respect to legal fees for 1957 is approved. For 1958 the respondent disallowed as a deduction the full amount of $1,800 claimed. There is no evidence to show that the respondent's determination was erroneous except that it has been shown that $300 thereof constituted payment to an attorney for preparation of petitioner's income tax return, and is therefore a deductible item. Promotion. The amount of $700 which the petitioner claimed as a deduction for promotional expenses for 1958, being an amount spent on behalf of a corporation in which the petitioner owned an interest, is clearly not deductible by the petitioner. Entertaining. The respondent disallowed the full amount claimed by the petitioner as a deduction on account of entertaining for each of the years in question. However, he allowed the full amount claimed for 1954 and one-half of the amount claimed for each of the years 1955, 1956, and 1957 as additional cost or selling expense of Delaware Cavendish stock, thereby reducing the amounts of the reported gains on the sales of such stock. The only evidence in the record with respect to *62 entertaining is the testimony of the petitioner that when he was in Canada attempting to obtain from the Canadian government a contract for the production of uranium ore by Canadian Cavendish he did certain entertaining. It is not clear from the record precisely when such entertainment occurred or whether the cost thereof is included in any amounts claimed as deductions on the petitioner's returns. In any event any amount so spent would clearly be a payment by the petitioner on behalf of the corporation and would not be deductible by him. Except for such testimony, the record is devoid of any evidence as to the entertainment expenses claimed. The respondent disallowed the deductions on the ground that the petitioner had failed to show that they were his expenses rather than those of a corporation or corporations in which the petitioner had an interest. Upon the record the respondent's determination is sustained. Hotels and meals. The respondent disallowed the full amount claimed by the petitioner for each of the years in question on account of the cost of hotels and meals, determining that the expenditures were nondeductible living expenses within the meaning of section 262 of the *63 Code and were not incurred in any business carried on by the petitioner or for the production or collection of his income or for the conservation, management, or maintenance of his property. Here also the petitioner has failed to present any detailed evidence as to the purpose for which these expenditures were incurred. From the record it appears that considerable travel was necessary in connection with the financing and other activities of the corporations in which the petitioner owned an interest but any such costs would not be deductible by the petitioner. If any portion of the amounts claimed constituted costs incurred in connection with the petitioner's investments which would be deductible under section 212, the petitioner has not so established, and the respondent's determination must be approved. Under the circumstances the so-called Cohan rule has no application. Chesbro v. Commissioner, (C.A. 2) 225 F. 2d 674. It is unnecessary to consider the question of where petitioner's "home" was for tax purposes. Transportation. The respondent disallowed as a deduction the full amount claimed by the petitioner on account of transportation in each of the years in question, but allowed *64 portions of the amounts claimed for the years 1954 through 1957 as additional cost or selling expense of the petitioner's Delaware Cavendish stock, thereby reducing the reported gains on sales of such stock in those years. The respondent determined that the petitioner had failed to establish that any amount claimed constituted his expense rather than of a corporation or corporations in which petitioner had an interest. Here again the record is devoid of detailed evidence of the purpose for which the transportation costs were incurred. The respondent's determination is approved. In his returns for the taxable years 1954 through 1957 the petitioner failed to claim a personal exemption for his wife, but by amended petition made claim therefor. The respondent has conceded that the petitioner is entitled to the personal exemption for each year. Decision will be entered under Rule 50. Footnotes
1. The testimony and the stipulation of facts refer to sales of Delaware Cavendish stock even after the merger in 1956 of Delaware Cavendish with Rare Earth Uranium Company. The petitioner upon the merger obtained in exchange for his old stock, stock of the merged company and presumably the reference to sales of Delaware Cavendish stock after the merger in 1956 has reference to sales of stock of the merged company.
*. Name of stock not shown, but presumably Delaware Cavendish.↩
2. Section 1221 provides in part as follows: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
3. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in conection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. In this connection it may be noted that there is no showing that the petitioner has ever written off his investment in Rochester stock as being worthless.↩
5. Section 212 provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. ↩
6. Section 1.212-1 of the regulations provides in part as follows: (b) The term "income" for the purpose of section 212 includes not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. * * * Expenses paid or incurred in managing, conserving, or maintaining property held for investment may be deductible under section 212 even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will other-wise be productive of income and even though the property is held merely to minimize a loss with respect thereto. * * *
(d) Expenses, to be deductible under section 212, must be "ordinary and necessary." Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income. * * *
(g) Fees for services of investment counsel, custodial fees, clerical help, office rent, and similar expenses paid or incurred by a taxpayer in connection with investments held by him are deductible under section 212 only if (1) they are paid or incurred by the taxpayer for the production or collection of income or for the management, conservation, or maintenance of investments held by him for the production of income; and (2) they are ordinary and necessary under all the circumstances, having regard to the type of investment and to the relation of the taxpayer to such investment. * * *
(k) Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. * * * (l) Expenses paid or incurred by an individual in connection with the determination, collection, or refund of any tax, whether the taxing authority be Federal, State, or municipal, and whether the tax be income, estate, gift, property, or any other tax, are deductible. Thus, expenses paid or incurred by a taxpayer for tax counsel or expenses paid or incurred in connection with the preparation of his tax returns or in connection with any proceedings involved in determining the extent of tax liability or in contesting his tax liability are deductible. * * *
(n) Capital expenditures are not allowable as nontrade or nonbusiness expenses. * * *↩
7. Section 263 of the Internal Revenue Code of 1954 provides in part that no deduction shall be allowed for "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."
8. Such portion would be deductible under section 162↩ of the Code if the petitioner's activities other than those in connection with the corporations constituted a trade or business, but the petitioner does not so contend and it is unnecessary to consider that question.
9. On brief neither party discusses the question whether the costs of "assessment work" are deductible exploration or development expenditures under sections 615 and 616 of the Code. Upon the record we cannot find that they are.↩